UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAMANDA DORGER, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>CITY OF NAPA, et al.,<br><br>    Defendants. | Case No. 12-cv-00440-WHO<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 74 |

On October 16, 2013, the Court held argument on defendants' motion for summary judgment. For the reasons discussed below, the Court GRANTS in part and DENIES in part the motion.

**BACKGROUND**

**I.　FACTUAL BACKGROUND**

On November 28, 2010, Richard Poccia was shot to death by a City of Napa police officer. On that day, the parties agree that Poccia was depressed, suicidal, intoxicated, and that he met the criteria for being involuntarily detained under California Welfare and Institutions Code section 5150. His wife testified that in the weeks preceding his death, Poccia had been depressed, drinking heavily, and carrying firearms. Deposition of Samanda Dorger[1] at 163-64, 170, 188-89, 206, 215-16. Days before he died, Poccia's wife testified that Poccia had given her a latex glove and a gun and asked her to kill him. Dorger Depo. at 222-23; Deposition of Amy E. Hunter[2] at 134-35. She also testified that Poccia had been suicidal. Dorger Depo. at 226.

On the morning on November 28th a friend of Poccia's, Dr. Steffen, visited him at his

---

[1] Excerpts of the Deposition of Samanda Dorger are located at Exhibit G to the Declaration of Gregory M. Fox.
[2] Excerpts of the Deposition of Amy E. Hunter are located at Exhibit A to the Fox Decl.; Ex. 1 to the Declaration of Khaldoun A. Baghdadi; and Exhibit A to the Fox Reply Decl.

house. *Id*. at 260; Hunter Depo. at 64. Dr. Steffen was concerned about Poccia's state of mind and about the gun that Poccia had with him. Another friend, retired police officer Ron Appel, was also concerned. Appel called the police department to notify them of Poccia's behavior, stating that Poccia was suicidal (or may have already committed suicide), had martial arts training, and possessed fire arms. Hunter Depo. at 104, 106. That call was how Poccia came to the attention of defendant Sergeant Amy Hunter. Hunter Depo. at 103-04.

Hunter contacted Appel and the two went to meet with Dorger and Dr. Steffen at the home of Dr. Steffen. Dorger Depo. at 260. During that meeting, Hunter was informed of Poccia's recent increasingly erratic and threatening behavior, including that he had had a potentially delusional episode with a gun in a park and that he had discharged a gun in his house sometime in the prior two days. Dorger Depo. at 261; Hunter Depo. at 120, 124, 126-27, 132-33. Dorger and Dr. Steffen told Hunter that Poccia was suicidal or a danger to himself. Hunter Depo. at 64. Dr. Steffen told her that Poccia said that if police or firefighters came to his residence that the responders would die, Poccia would die, or they'd both die. Hunter Depo. at 144.

Based on what Dorger and Dr. Steffen had told her, Hunter believed that Poccia was a danger to himself and that he should be detained under section 5150. *Id*. 73. Hunter knew that Poccia had multiple firearms, including the one noticed by Dr. Steffen earlier in the day, and that he was trained in martial arts. *Id*. at 89-90, 110. Hunter contacted Napa County Mental Health and asked them to attempt to make contact with Poccia. Hunter Depo. at 142. Hunter also contacted Kaiser to attempt to get information about Poccia from them. *Id*. at 146. Hunter wrote and circulated an email describing her information on Poccia, his current mental state, and the fact that Poccia had threatened to kill firefighters and police officers if they came into his residence. *Id*. 147-48. After she was informed that no one from Napa County Mental Health had been able to reach him, Hunter attempted to reach Poccia on the phone, but he hung up on her. Hunter Depo. at 151.

Meanwhile, after the meeting with Hunter, Appel, Steffen and Dorger had broken up, Poccia texted "Help" to Dorger three times and the two spoke on the phone at 1:30 p.m. Dorger Depo. at 266-67. Poccia asked Dorger to go to the store and buy him alcohol, or else he would

leave the house and buy it himself. *Id*. 267, 272, 275-75. Dorger called Hunter to let her know that Poccia intended to go to the store to buy alcohol. *Id*. 275. Hunter, after speaking with command staff, had officers head to Poccia's house in an unmarked van in order to observe Poccia's movement. Declaration of Heath Morrison, ¶¶ 3-4; Hunter Depo. at 160.

Hunter then phoned Poccia again and spoke with him. During this call Poccia appeared to be coherent and cooperative. Hunter Depo. at 162. Hunter informed Poccia that she wanted to do a welfare check on him, and Poccia agreed to come out and speak with Hunter about her and his friends' concerns that he was suicidal and needed help. *Id*. at 163, 165, 172.

Hunter testified that in dealing with individuals who are in mental crisis, it is important to "slow things down," speak to the person in a calm manner, and "do things in as least threatening a manner that you're able to do," while keeping officer safety at the forefront. Hunter Depo. at 69-71. Hunter agreed that having a firearm pointed at an individual in a mental health crisis would be considered threatening. *Id*. at 72. She testified that she would not have disclosed to an individual she was trying to get out of a house to perform a 5150 evaluation that officers on the scene were armed or where the officers were located, because that would discourage the person from cooperating and could endanger officer safety. Hunter Depo. at 168-69, 170-72, 180-82. She also testified she would not tell an individual she was trying to get out of a house to perform a 5150 evaluation that she or other officers intended to detain that individual, because it would likewise discourage them from cooperating. *Id*. at 192-93.

After speaking with Poccia, Hunter and other units headed to the scene. Hunter, as the ranking officer, put into action a plan that she would get Poccia to leave the house and be handcuffed so that she could determine whether to further detain Poccia under section 5150. *Id*. at 175-77. Hunter assigned Officer Morrison to assemble a "designated apprehension team" or "emergency response team" (ERT) for lethal and less-lethal force. *Id*. at 176; Morrison Decl., ¶ 6. Morrison was designated to be the officer in charge of giving voice commands once Poccia left his house. *Id*. at 177.

Once on the scene, and after ERT had assembled, Hunter had another phone conversation with Poccia. Hunter Depo. at 173. Hunter explained to Poccia that after he was out of the house,

3

1 he would receive commands from "an officer" and that he should follow those commands, the
2 officer will check him for weapons and make sure Poccia was safe, and then he and Hunter would
3 talk. *Id*. at 180. Poccia agreed to come out of the house without any firearms. *Id*. at 179. Hunter
4 did not tell Poccia how many officers would be on the scene, or whether the officers would be
5 armed. *Id*. at 168-69, 180-82. Poccia was not informed he would be handcuffed or that he would
6 be detained. *Id*. at 181, 193.

7 The team that was picked to detain Poccia, including defendant Dalessi, was located
8 behind a cinder block wall near Poccia's house. *Id*. at 181-82. The plan was that once Poccia left
9 the house, Officer Morrison would make verbal contact and give Poccia directions to turn around
10 and walk backwards towards his voice until Poccia reached a safe distance, and then the officers
11 would detain him and check him for weapons. *Id*. at 187, 189-90; Deposition of Nicholas Dalessi[3]
12 at 154; Deposition of Brad Baker[4] at 128. Dalessi was informed that Poccia was suicidal, had
13 asked his wife to kill him a few days prior, was intoxicated, owned numerous firearms, had
14 discharged a firearm inside the house, had a firearm on him that day, was trained in martial arts,
15 and had made threats that he would shoot police or paramedics if they came to his house. Dalessi
16 Depo. at 122. Dalessi was armed with a rifle and his role was to provide "long cover and lethal
17 cover" during the operation. *Id*. at 162.

18 When Poccia left his house, he was cooperative initially. Hunter Depo. at 205. Officer
19 Morrison called out to Poccia and advised him that they wanted to talk to him, that they needed to
20 make sure he had no weapons, and that it was very important that Poccia listen to and follow his
21 directions. Declaration of Heath Morrison, ¶ 9. As directed, Poccia moved to the street and
22 started walking backwards towards Morrison and then turned to continue walking forward facing
23 Morrison. *Id*.

24 When Poccia was about 20 feet away from the ERT officers, Morrison testified, Poccia
25 appeared to become startled. Morrison told Poccia to stay calm, focus on him, and that he needed
26 to keep his hands up. Morrison instructed Poccia to turn around and walk backwards towards the

---

[3] Excerpts of the Deposition of Nicolas Dalessi are located at Exhibit B to the Fox Decl.
[4] Excerpts of the Deposition of Brad Baker are located at Exhibit C to the Fox Decl.

sound of his voice. *Id*. ¶ 10.

Then Poccia's demeanor changed. Morrison and other officers testified that Poccia became more aggressive and stopped obeying Morrison's directions. Hunter Depo. at 205-06; Morrison Decl. ¶ 11; Declaration of Joshua Coleman, ¶ 6. Officer Baker believed Poccia was surprised by the guns the officers had. Baker Depo. at 136, 139-40. Poccia started swearing and yelling at the officers and started to back up. Morrison Decl. ¶ 11; Coleman Decl. ¶ 8; Dalessi Depo. at 174-81. Poccia then took an "aggressive" stance. Hunter Depo. at 212, 218-19; Dalessi Depo. at 184. Hunter radioed that it was OK to use a taser on Poccia. Hunter Depo. at 219, 220.

Here is where the testimony of the witnesses diverge. Officers testified that Poccia quickly moved or "dived" his hands down into his waistband area. Hunter Depo. at 100-101; Morrison Decl. ¶ 12; Coleman Decl. ¶ 8; Dalessi Depo. at 184. Officer Dalessi believed he saw Poccia grab the small black handle of a handgun from his waistband. *Id*. at 192-93. He testified that Poccia reached into the "right portion of his waistband, grabs hold of a gun, at which point I fire one shot." Dalessi Depo. at 184.

The other officers on the scene saw and heard basically the same thing, with some variation. Dalessi did not hear any order to tase Poccia prior to firing his weapon. *Id*. 196. Hunter did not see a gun, but there was no doubt in her mind "that he was going for a gun." *Id*. at 103. Morrison thought Poccia was reaching for a gun. Morrison Decl. ¶ 12. Officer Baker saw Poccia withdraw a knife from his waistband or right pocket. Baker Depo. at 91. Officer Baker shouted "taser" and then deployed his taser when he saw Poccia withdraw the knife. *Id*. at 93, 94.

After Poccia was shot and tased, Officer Coleman testified that he stepped in to handcuff Poccia, placing his arms behind his back. Coleman Decl. ¶ 9. Coleman does not say what type of cuffs he placed on Poccia. Dalessi testified that he asked Officer Coleman whether Poccia had a gun, and Coleman responded no, that Poccia was pulling a knife. Dalessi Depo. at 200. A knife was found towards Poccia's head. Declaration of Alexander Jason ¶ 11.

A neighbor of Poccia's, Aaron Olsen, watched the events unfold from about 150 feet from

5

1 where Poccia was shot. Deposition of Aaron Olsen[5] at 82. Olsen testified that Poccia seemed
2 drunk and angry, and upset by the guns. Olsen Depo. at 22-23, 45, 109. Olsen testified that he
3 thought Poccia was startled by the officers, and that he saw Poccia's hand come down to his "belt
4 line" area, but he did not see Poccia's hands come into contact with his waistband. Olsen Depo. at
5 43, 53, 55, 115. Olsen testified that Poccia was not handcuffed when Poccia was shot, and that he
6 saw Poccia being handcuffed after he was shot. *Id*. at 61, 114-15.

7 Another neighbor, Diana Greenwood, was watching from her yard. She testified that
8 Poccia was upset or surprised by the officers' guns. Deposition of Diana Greenwood[6] at 40, 41,
9 43. Ms. Greenwood's location obscured her view as events developed, and so she went indoors to
10 a window where she would have a clearer view. Greenwood Depo. at 44, 48-49. While she was
11 still outside, Poccia was walking, his hands were up and he was not handcuffed. *Id*. at 51. Then
12 she went inside. By the time she reached a window where she could see the events, which was
13 moments after she heard the pop of a gun, Poccia was in handcuffs on the ground. *Id*. at 51.
14 Greenwood did not see an officer shoot Poccia, and did not see when Poccia was handcuffed. *Id*.
15 at 49, 75. Given the short timeframe between the pop of the gun and her viewing Poccia on the
16 ground in cuffs, she believes Poccia must have been in handcuffs when he was shot. *Id*. at 54.
17 Greenwood testified that the handcuffs on Poccia were white plastic zip ties. *Id*. at 55.

18 Paula Dunn, a third neighbor, watched from her yard. She testified that she saw Poccia's
19 hands behind his back between the time she heard a "pop," which she believed was a gun, and the
20 time Poccia was on the ground. Deposition of Paula Dunn[7] at 40. She did not recall Poccia
21 making a sudden grasp into his waistband, but testified it was possible that she missed it. *Id*. at 31,
22 71. Dunn testified that she believed that Poccia was handcuffed with a clear plastic cord before he
23 was on the ground when she heard someone shout "Taser. Taser. Taser." *Id*. at 17, 58, 69. Dunn
24 testified that after hearing "Taser. Taser. Taser.," an officer drew what she believed to be a gun

---

[5] Excerpts from the Deposition of Aaron Olsen are located at Exhibit B to the Fox Decl. and Exhibit 4 to the Baghdadi Decl.
[6] Excerpts from the Deposition of Diana Greenwood are located at Exhibit E to the Fox Decl.; Exhibit 6 to the Baghdadi Decl., and Exhibit C to the Fox Reply Decl.
[7] Excerpts from the Deposition of Paula Dunn are located at Exhibit F to the Fox Decl.; Exhibit 5 to the Baghdadi Decl.; and Exhibit D to the Fox Reply Decl.

United States District Court
Northern District of California

or a "pistol," pointed it at Poccia's head and used it. *Id*. at 59, 61.

## II. PROCEDURAL BACKGROUND

In January 2012, Poccia's wife and daughter filed this wrongful death action. The operative complaint (Docket No. 53) alleges: violation of 42 U.S.C. section 1983 for excessive force against defendant Dalessi; violation of section 1983 for "danger creation," against defendants Hunter and Dalessi; violation of section 1983 for violation of Poccia's spouse and child's liberty interests, against defendant Dalessi; a California negligence/wrongful death claim, against defendants Hunter and Dalessi; and a claim under California Civil Code sections 52 and 52.1(b) for denial of civil rights, against defendants Hunter and Dalessi.[8]

Currently before the Court is defendants' motion for summary or partial summary judgment.

## LEGAL STANDARD

Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party, however, has no burden to disprove matters on which the non-moving party will have the burden of proof at trial. The moving party need only demonstrate to the Court that there is an absence of evidence to support the non-moving party's case. *Id*. at 325.

Once the moving party has met its burden, the burden shifts to the non-moving party to "set out 'specific facts showing a genuine issue for trial.'" *Id*. at 324 (quoting then-Fed. R. Civ. P. 56(e)). To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving

---

[8] By stipulation, the parties dismissed defendants Baker and the City of Napa (except as to its respondeat superior liability) and the Fourth Cause of Action. *See* Docket No. 68.

7

party].” *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 252 (1986).

In deciding a summary judgment motion, the court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor. *Id*. at 255. “Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment.” *Id*. However, conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill Publ'g Co., Inc. v. GTE Corp*., 594 F.2d 730, 738 (9th Cir. 1979). The evidence the parties present must be admissible. Fed. R. Civ. P. 56(c)(2).

## DISCUSSION

## I. FOURTH AMENDMENT EXCESSIVE FORCE CLAIM AGAINST OFFICER DALESSI

### A. Excessive Force

Excessive force claims are analyzed under the Fourth Amendment's objective reasonableness standard as articulated in *Graham v. Connor*, 490 U.S. 386, 399 (1989), and *Tennessee v. Garner*, 471 U.S. 1 (1985). Determining whether the force used was reasonable requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake. *Graham*, 490 U.S. at 396. The test of reasonableness requires a careful attention to the facts and circumstances of each particular case, including: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight. *Graham*, 490 U.S. at 396. In the context of a lethal use of force, defendants must demonstrate that the officer had “probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.” *Tennessee*, 471 U.S. at 3. “The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.” *Graham*, 490 U.S. at 396-97.

Defendants argue that the undisputed facts show that Office Dalessi acted with reasonable force, given the information about Poccia's ownership of firearms, recent behavior with firearms, evidence of mental health issues, his aggressive behavior towards the officers during the confrontation, and in light of his (and other officers) belief that Poccia reached for and was taking out a gun or knife. Defendants rely on Ninth Circuit cases holding that lethal force was appropriately used when suspects, believed to be armed, moved their arms towards their waistbands. *See, e.g., Estate of Moppin-Buckskin v. City of Oakland*, C 08-04328 CW, 2010 WL 147976 (N.D. Cal. Jan. 12, 2010) ("belligerent behavior, reluctance to comply with commands, the lowering of his hands and reaching towards his waistband and his statement that he didn't 'give a fuck' if the officers shot him because he had been shot before, would lead a reasonable officer to believe he was reaching for a weapon."); *Foster v. City of Fresno*, 392 F. Supp. 2d 1140, 1159 (E.D. Cal. 2005) (lethal force justified where dangerous suspect in a series of armed robberies, who was believed to be armed, refused to comply with the officers' orders and returned his hand to his waistband area); *see also Blanford v. Sacramento Cnty*., 406 F.3d 1110, 1116 (9th Cir. 2005) (deputies had cause to use lethal force because they believed plaintiff posed a serious danger to themselves and others, "because he failed to heed warnings or commands and was armed with an edged weapon that he refused to put down.").

Plaintiffs respond by relying on the non-officer witness testimony of Olsen, Dunn and Greenwood, none of whom testified that they saw Poccia reach into his waistband for a weapon and two of whom testified that Poccia was handcuffed with plastic zip ties at the time of the shooting. They argue that this testimony creates a material disputed issue of fact for the jury to decide.

Defendants disagree. With respect to Olsen, defendants note that Olsen testified – consistent with the officers – that Poccia moved his hand towards his "belt line," even if Olsen did not see whether Poccia reached into his waistband. As to Greenwood, defendants point out that she did not see the actual shooting of Poccia, so she could not testify as to whether Poccia took out, or attempted to take out a knife, from his waistband. Greenwood also had no knowledge about when Poccia was cuffed but *assumed* he was cuffed prior to the shooting based on the

9

timing of her moving towards the window where she saw Poccia on the ground following the shot.

As to Dunn, defendants argue that her testimony cannot create a genuine issue of material fact because she was confused about the use of the Taser by Coleman (which Dunn believed caused the fatal head wound) and because Dunn neither saw Dalessi's rifle nor saw Dalessi shoot Poccia. *See* Reply Br. at 6-7. Defendants also point out that Greenwood and Dunn's testimony that Poccia was cuffed with white plastic zip ties is contrary to photographic evidence from the scene showing Poccia cuffed with metal handcuffs.

While Dunn's testimony about how she believed Poccia died (*i.e.*, who held the gun that was used to shoot him) may be contrary to the undisputed physical evidence, she also testified that she believed Poccia was handcuffed when he was shot. Her handcuff testimony may be contradictory to all of the officers' testimony, as well as Olsen's, but it has not been undermined by undisputed physical evidence. The only evidence as to *how* Poccia was cuffed at some point, other than the testimony of Greenwood and Dunn that plastic ties were used, is the copy of the photograph of attached as Exhibit E to the Fox Reply Declaration, showing metal cuffs on an apparently deceased Poccia. However, the photograph in Exhibit E has not been authenticated and there is no testimony as to when that photograph was taken. There is *no* testimony, by deposition or declaration, and no authenticated documentary evidence demonstrating that Poccia was cuffed only by metal cuffs and explaining when that allegedly occurred.[9] But more importantly, the critical testimony from Dunn is that Poccia was handcuffed when he was shot, not what type of handcuffs were used. The testimony of Dunn, corroborated to some degree by Greenwood, that Poccia was handcuffed when he was shot creates a material question of fact.

Much of Ms. Dunn's testimony may be contrary to the physical evidence. She apparently misunderstood or misperceived which officer was responsible for the fatal shot. That will surely

---

[9] This case, therefore, is not like *Scott v. Harris*, 550 U.S. 372, 380 (2007), where the Supreme Court held that when "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." In *Harris*, the record – a videotape showing the car chase that led police offices to stop a fleeing motorist by ramming his car – contradicted the plaintiff's version of events.

be weighed by the jury in determining the credibility of Dunn's testimony.  However, the Court cannot disregard Ms. Dunn's unequivocal testimony that she believed Poccia was cuffed at the time he was shot.   Accordingly, the Court cannot say on summary judgment that Officer Dalessi's use of lethal force was reasonable as a matter of law.

### B. Qualified Immunity

The threshold inquiry in a qualified immunity analysis is whether the plaintiff's allegations, if true, establish a constitutional violation. *Wilkins v. City of Oakland*, 350 F.3d 949, 954 (9th Cir.2003) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).  If so, the Court proceeds to the second step of the analysis, to determine whether the actions alleged violate a clearly established constitutional right. *Wilkins*, 350 F.3d at 954. Clearly established means that "'it would be clear to a reasonable officer that his conduct was unlawful *in the situation he confronted*.'" *Id*. (quoting *Saucier*, 533 U.S. at 202, emphasis in original).  In other words, "[f]or a constitutional right to be clearly established, its contours 'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)); *see also Boyd v. Benton Cnty*., 374 F.3d 773, 780-81 (9th Cir. 2004).  The reasonable officer avoids committing not only those acts that have been clearly established as unconstitutional, but also similar acts even where there is no case specifically addressing them, so long as existing law provides fair warning that those acts, too, are unconstitutional. *See Hope v. Pelzer*, 536 U.S. at 739–43; *Mattos v. Agarano*, 661 F.3d 433, 442 (9th Cir.2011).

In excessive force cases, such as this one, the relevant inquiry is whether, "'under the circumstances, a reasonable officer would have had fair notice that the force employed was unlawful, and [whether] any mistake to the contrary would have been unreasonable.'" *Boyd*, 374 F.3d at 781 (quoting *Drummond v. City of Anaheim*, 343 F.3d 1052, 1060 (9th Cir.2003)). Qualified immunity is an affirmative defense and therefore the burden of proof is on the public official asserting immunity. *Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1981).  In determining whether qualified immunity exists, the court must "construe the facts, overwhelming or otherwise, in [plaintiffs'] favor." *Johnson v. Bay Area Rapid Transit Dist*., 724 F.3d 1159 (9th Cir. 2013).

1   Here, accepting plaintiffs evidence that Poccia was cuffed when he was shot, as the Court
2   must, qualified immunity cannot shield Dalessi's use of force as a matter of law.

**II.   "DANGER CREATION" CLAIM**

Plaintiffs argue that the actions of Hunter, and then Dalessi, placed Poccia into an unconstitutionally dangerous situation.  Specifically, plaintiffs allege that Hunter and Dalessi's "planning, coordinating, and implementing the police strategy for approaching and detaining decedent, with reckless or conscious disregard for, and deliberate indifference to, the creation or increased risk of danger caused by that strategy, which failed to account for decedent's known mental health condition, thereby depriving decedent of his constitutionally-protected rights, including but not limited to, the rights guaranteed by the Fourteenth Amendment to the United States Constitution."  TAC ¶ 43 (Second Claim for Relief).  Plaintiffs contend that this cause of action is cognizable as a due process violation under the Fourteenth Amendment, where "state action creates or exposes an individual to a danger which he or she would not have otherwise faced."  *Johnson v. City of Seattle*, 474 F.3d 634, 639 (9th Cir. 2007).  However, as the Ninth Circuit explained in *Johnson*, that type of "danger creation" claim arises only where state actors fail to protect plaintiffs "from harm inflicted by third parties." *Id*. at 639.[10]

Here, the harm resulting from the "danger creation" was inflicted by the police officers.  In that circumstance, plaintiffs are alleging a *Fourth* Amendment claim for "provoking a confrontation."  *See, e.g., Espinosa v. City & Cnty. of San Francisco*, 598 F.3d 528, 538 (9th Cir. 2010).  In order to allege a claim that police officers "intentionally or recklessly provoke[ed] a confrontation," *Espinosa*, 598 F.3d at 538, plaintiffs must show that the "provocation" which led

---

[10]  In *Johnson*, the claim was that police officers failed to adequately protect plaintiffs from the violence of third parties.  Each of the cases discussed by the Ninth Circuit in *Johnson* likewise address claims that police officers or other municipal actors *placed* plaintiffs in places where they could either harm themselves or be harmed by third parties.  *See, e.g., Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1061 (9th Cir.2006) (police action exposed plaintiff to danger from neighbor); *Munger v. City of Glasgow Police Dep't*, 227 F.3d 1082 (9th Cir.2000) (police removed drunk patron from bar and patron froze to death); *L.W. v. Grubbs*, 974 F.2d 119 (9th Cir.1992) (defendants exposed plaintiff to risk of rape from violent predator inmate), *Penilla v. City of Huntington Park*, 115 F.3d 707 (9th Cir.1997) (per curiam) (police locked mentally ill person in home and person died); *Wood v. Ostrander*, 879 F.2d 583 (9th Cir.1989) (police left victim along in high crime area and victim was assaulted).

12

to the exercise of police force was itself "an independent Fourth Amendment violation." *Id*. at 538-39 (initial entry into a home, which led to violent confrontation, was possible independent Fourth Amendment violation); *see also Billington v. Smith*, 292 F.3d 1177, 1190-91 (9th Cir. 2002) (if an officer "intentionally or recklessly provokes a violent response, and the provocation is an independent constitutional violation, that provocation may render the officer's otherwise reasonable defensive use of force unreasonable as a matter of law."); *Burns v. City of Redwood City*, 737 F. Supp. 2d 1047, 1061 (N.D. Cal. 2010) (finding questions of fact as to whether "initial aggression" steps, including use of pepper spray and physical "take-down," that provoked subsequent injuries were constitutionally reasonable).[11]

Plaintiffs have failed to allege or point to evidence demonstrating that either of the defendants' preshooting conduct constitutes an independent *constitutional* violation. At oral argument, plaintiffs argued that when Poccia discovered the armed officers he felt unable to leave and he was, therefore, unconstitutionally *detained* prior to the use of force. However, the record is undisputed that at the time of the incident Poccia met the criteria for a 5150 hold or at least a 5150 evaluation, and therefore, he could be detained for that evaluation. Moreover, plaintiffs cite no case law that would support their assertion that the officers' conduct in their attempt to "detain" Poccia for the 5150 evaluation rose to the level of an unconstitutional provocation under the Fourth Amendment.

On this record, absent any expert testimony or other evidence from plaintiffs, defendants' preshooting conduct did not constitute an independent constitutional violation. Defendants' motion for summary judgment as to the Second Claim for Relief is GRANTED.

---

[11] Plaintiffs' reliance on *Alexander v. City & Cnty. of San Francisco*, 29 F.3d 1355, 1357 (9th Cir. 1994), is not to the contrary. In *Alexander*, plaintiff's claim was that the "storming of the house" was unreasonable and created the unconstitutional danger; plaintiff did not contest the reasonableness of the subsequent use of lethal force. *Id*. at 1366. Subsequent to *Alexander*, the Court in *Billington* confirmed that an independent constitutional violation is required to state a claim for "danger creation" resulting in harm inflicted by police officers. *Billington*, 292 F.3d at 1190. Finally, plaintiffs' reliance on *Gibson v. Cnty. of Washoe, Nev.*, 290 F.3d 1175, 1186 (9th Cir. 2002), is misplaced. *Gibson* addressed alleged failures to provide medical care to persons in municipal custody.

13

### III. 14TH AMENDMENT CLAIM FOR DEPRIVATION OF FAMILIAL RIGHTS

Plaintiffs' third claim is for violation of the Fourteenth Amendment "liberty interest of Samanda Dorger and Gabrielle Poccia in their personal capacities, in maintaining their familial relationships with decedent," asserted against Dalessi. TAC ¶¶ 46-49. This claim is based on the same facts as the Fourth Amendment excessive force claim. A substantive due process claim under the Fourteenth Amendment based on deprivation of the liberty interest arising out of familial relations may be asserted by the family of a person killed by law enforcement officers. *Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 371 (9th Cir.1998). The Fourteenth Amendment inquiry is distinct from a Fourth Amendment excessive force claim, however. *See Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir.2010) (analyzing each claim separately). Under the Fourteenth Amendment, "only official conduct that 'shocks the conscience' is cognizable as a due process violation." *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir.2008).

"In determining whether deliberate indifference is sufficient to shock the conscience, or whether the more demanding standard of purpose to harm is required, the critical consideration [is] whether the circumstances are such that actual deliberation is practical." *Tennison v. City & County of San Francisco*, 570 F.3d 1078, 1089 (9th Cir.2009) (internal quotation marks omitted) (alteration in original). This is because an officer faces a "fast paced, evolving situation presenting competing obligations with insufficient time for the kind of actual deliberation required for deliberate indifference." *Porter*, 546 F.3d at 1142. So, for example, if a suspect acts in an evasive manner that requires officers to react quickly, the officers may be held liable only if they acted with a purpose to harm. *Porter*, 546 F.3d at 1140. A purpose to harm means "a purpose to harm unrelated to legitimate law enforcement objectives." *Wilkinson*, 610 F.3d at 554.

Here, plaintiffs' Fourteenth Amendment claim is based on the killing of Poccia, which deprived them of their liberty interest to enjoy their family relations with him. Whether Dalessi was deliberately indifferent when deliberation was possible or acted with purpose to harm turns on whether Poccia was in handcuffs at the time of the shooting, as Dunn testified. If the jury determines that Poccia was in cuffs at that point, and that Dalessi knew it, his conduct readily meets the "shocks the conscious" standard.

14

## IV. NEGLIGENCE CLAIM

Plaintiffs Fifth Claim for relief is a state law wrongful death claim against all defendants. Plaintiffs allege that "[d]efendants planned, coordinated, and implemented a police strategy for approaching and detaining decedent in a negligent manner that created or increased the risk of danger caused by that strategy, which, in particular, failed to account for decedent's known mental health distress. Officers Baker and Dalessi used excessive and lethal force in response to behavior by decedent that was non-threatening, without risk of injury to himself or others." TAC, ¶ 67.

The California Supreme Court "has long recognized that peace officers have a duty to act reasonably when using deadly force." *Hayes v. Cnty. of San Diego*, 57 Cal. 4th 622, 629 (2013). The cause of action is grounded in the tort of negligence and the corresponding duty of police officers to act reasonably when using deadly force. *Id*. As the Court explained, "[t]he reasonableness of an officer's conduct is determined in light of the totality of circumstances," which includes preshooting circumstances. *Id*. at 629-30. Those preshooting circumstances might show that an otherwise reasonable use of deadly force was in fact unreasonable, such as where officers negligently provoke a dangerous situation in which the subsequent use of deadly force was justified. *Id*. at 630.

In this case, as in *Hayes*, "the one injury plaintiff alleged is the loss of her father. Thus, this case involves a single primary right (plaintiff's right not to be deprived of her father by an improper use of deadly force), which necessarily corresponds to a single duty (the duty not to use deadly force in an improper manner), and the breach of that duty gives rise to a single indivisible cause of action." *Id*. at 631. In other words, plaintiffs cannot allege a negligence cause of action solely based on the preshooting conduct because they have not alleged an injury other than the death of Poccia. As plaintiffs here do not allege a *separate* injury from the preshooting conduct by the defendants, the preshooting conduct "is only relevant here to the extent it shows, as part of the totality of circumstances, that the shooting itself was negligent." *Id*.

Finally, as the California Supreme Court recognized, "[a]s long as an officer's conduct falls within the range of conduct that is reasonable under the circumstances, there is no requirement that he or she choose the 'most reasonable' action or the conduct that is the least

15

likely to cause harm and at the same time the most likely to result in the successful apprehension of a violent suspect, in order to avoid liability for negligence." *Brown v. Ransweiler*, 171 Cal.App.4th 516, 537–538 (2009); *Hayes*, 57 Cal. 4th at 632. Further, "[a]lthough preshooting conduct is included in the totality of circumstances, we do not want to suggest that a particular preshooting protocol (such as a background check or consultation with psychiatric experts) is always required. Law enforcement personnel have a degree of discretion as to how they choose to address a particular situation. Summary judgment is appropriate when the trial court determines that, viewing the facts most favorably to the plaintiff, no reasonable juror could find negligence." *Hayes*, 57 Cal. 4th at 632.

Here, because the question of negligence under California law cannot be based solely on the preshooting conduct, but the preshooting conduct must be considered as part of the totality of circumstances to determine whether the use of deadly force was reasonable, summary judgment cannot be granted to the defendants. As noted above, there is a genuine issue of material fact as to whether Poccia's hands were cuffed when he was shot. That disputed fact weighs heavily on whether the shooting was reasonable.

Defendants argue that there can be no negligence claim against Hunter, because Hunter "used no actual force against Poccia and caused no separate injury to him or plaintiffs." Reply Br. at 12. However, whether Hunter's preshooting conduct (*e.g.,* her plan to detain Poccia, including the presence of armed officers) played a role in negligently provoking a dangerous situation that resulted in the use of reasonable or unreasonable use of lethal force, is relevant under the totality of the circumstances test.[12]

## V. SECTION 52.1 CLAIM

Plaintiffs' Sixth Claim for relief alleges a violation of California's Bane Act, Civil Code 52.1, against all defendants. Civil Code section 52.1, subdivision (a), provides that if a person

---

[12] Plaintiffs argue that they may somehow, despite *Hayes*, still assert a stand-alone claim against Hunter for her preshooting conduct. Oppo. Br. at 22. Plaintiffs ignore, however, that there is only one alleged injury in this case – the shooting death of Poccia. In that circumstance, the California Supreme Court in *Hayes* was clear that the preshooting conduct is only relevant to the question of whether, under the totality of the circumstances, the shooting was reasonable.

16

interferes, or attempts to interfere, by threats, intimidation, or coercion, with the exercise or enjoyment of the constitutional or statutory rights of "any individual or individuals," the Attorney General, or any district or city attorney, may bring a civil action for equitable or injunctive relief. Subdivision (b) allows "[a]ny individual" so interfered with to sue for damages. Plaintiffs allege that "defendants interfered with decedent's rights guaranteed by the Fourth Amendment to the United States Constitution and Art. 1, §13 of the California Constitution." TAC, ¶ 75. In, *Shoyoye v. Cnty. of Los Angeles*, 203 Cal. App. 4th 947 (2012), the Court clarified that the Bane Act "was intended to address only egregious interferences with constitutional rights, not just any tort. The act of interference with a constitutional right must itself be deliberate or spiteful." *Id*. at 959. The Court also clarified that the statute requires a showing of coercion independent from the coercion *inherent* in the constitutional deprivation. *Id*.at 969.

Plaintiffs argue in their opposition brief that Hunter "drew the decedent out of his home under the false pretense of a low-key conversation with the police, only to ensnare him in a SWAT-style confrontation. This was coercive and intimidating." Oppo. Br. at 22. As to Dalessi, plaintiffs argue that he "approached Mr. Poccia with his rifle raised toward decedent's head prior to the shooting, which certainly was threatening, intimidating, and coercive behavior." *Id*. This alleged conduct, however, cannot support a claim that defendants *deliberately or spitefully* coerced, intimidated or threatened Poccia, and there is no other evidence in the record of any coercion, intimidation or threat.

With respect to defendant Hunter, there is no evidence that she used any form of coercion, intimidation or threats in order to establish communication with Poccia or to get him to agree to come out of the house so that she could check on his welfare. With respect to defendant Dalessi, while he was carrying a rifle to ensure officer safety and provide "long cover," there is no evidence that Dalessi used that rifle in deliberate way to intimidate or coerce Poccia to prevent Poccia "from doing something he or she had the right to do under the law or to force the plaintiff to do something that he or she was not required to do under the law." *Shoyoye*, 203 Cal. App. 4th at 955-56; *see also id*. at 971 ("any intimidation or coercion that occurred was simply that which is reasonable and incident to maintaining a jail. The coercion was not carried out in order to effect a

17

knowing interference with Shoyoye's constitutional rights.").[13]  Similarly, there is no evidence that Dalessi used threats (or threatening language) against Poccia.  Instead, the only evidence on that score is the officers' testimony that they attempted to calm Poccia down.[14]

In sum, there is no evidence that either Hunter or Dalessi deliberately threatened, intimidated, or coerced Poccia.  Defendants are GRANTED summary judgment on plaintiffs' Sixth Claim under the Bane Act.

## VI. DEFENDANTS' IMMUNITY

Defendants argue that Hunter and Dalessi are immune from California tort liability under California Government Code section 820.2 and the City is immune under section 815.2.  Section 820.2 provides that "[e]xcept as otherwise provided by this statute, a public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of discretion vested in him, whether or not such discretion be abused."  Section 815.2 provides that a public entity is immune where the employee is immune.  As to section 820.2, "it has long been established that this provision does not apply to officers who use unreasonable force in making an arrest."  *Blankenhorn v. City of Orange*, 485 F.3d 463, 487 (9th Cir. 2007); *see also Bell v. State of California*, 63 Cal. App. 4th 919, 929 (1998) (discretionary immunity is limited to "basic policy decisions").  As the reasonableness of the force used against Poccia has not been established, the immunities provided under section 820.2 and 815.2 cannot yet be applied in this case.

Finally, defendants argue that defendant Hunter cannot be held liable for the use of force

---

[13] While plaintiffs' counsel in the opposition brief contend that the officers were "screaming" at Poccia, Oppo. Br. at 15, they cite to no evidence of "screaming" from witnesses who were in close enough proximity to hear what the officers were saying to Poccia.  There is likewise no evidence that Dalessi was screaming at Poccia at any time. At oral argument, plaintiffs alleged that Dalessi's "shouting" at Poccia during the confrontation could also constitute coercion and intimidation.  However, there is no citation in the opposition brief to any testimony showing that Dalessi was shouting at Poccia.

[14] The only case plaintiffs' rely on is *Cole v. Doe 1 thru 2 Officers of City of Emeryville Police Dept.*, 387 F. Supp. 2d 1084, 1102-04 (N.D. Cal. 2005). *See* Oppo. Br. at 23.  However, as recognized by the *Shoyoye* Court, the holding of *Cole* focused on whether the use or attempted use of excessive physical force or violence must be alleged at the pleading stage, and the analysis of state law in the California Court of Appeal's decision in *Shoyoye* undermines the *Cole* Court's conclusion.  *Shoyoye*, 203 Cal. App. 4th at 960-61.

by Dalessi because Government Code section 820.8 prohibits a public employee from being held liable is for an injury caused by the act or omission of another person. However, the only claim left against Hunter is the negligence claim which, as noted above, can be based in part on Hunter's preshooting conduct. Hunter is not threatened with liability for any acts other than her own.

Defendants also argue that they are immune under Welfare and Institutions Code section 5278, which provide that an individual authorized to detain a person pursuant to section 5150 "shall not be held … liable for exercising this authority in accordance with the law." On its face, immunity only applies if the detention was in accordance with the law. *See e.g., Bias v. Moynihan*, 508 F.3d 1212, 1221 (9th Cir. 2007); *see also Gonzalez v. Paradise Valley Hosp.*, 111 Cal. App. 4th 735, 741-42, 3 Cal. Rptr. 3d 903, 907 (2003) ("the protected conduct is confined to the exercise of statutory authority to detain, evaluate and treat against the patient's wishes, and does not extend to the manner in which evaluation and treatment are carried out. In other words, liability arising from negligent evaluation or treatment is not liability arising from the 'exercis[e of] this authority in accordance with the law.'").

Here, there has been no finding that the actions taken with respect to Poccia were "in accordance with the law," and so section 5278 cannot shield defendants from plaintiffs' claims of negligence at this juncture.

## VII. EVIDENTIARY OBJECTIONS

Plaintiffs make evidentiary objections to portions of the expert declarations submitted by defendants. *See* Docket No. 81-1. Plaintiffs did not comply with this Court's Local Rule, which requires evidentiary objections to be contained within plaintiffs' opposition brief. *See* Civil Local Rule 7-3(a). Nevertheless, the Court has considered the objections and finds that it need not address them because, in reaching its conclusion on this motion the Court did not rely on the Declarations of Alexander Jason or Emily Keram. Neither of those declarations have any relevance to or bearing on the material question of fact identified by the Court--was Poccia handcuffed prior to the shooting.

Defendants object to unspecified portions of the testimony of Olsen, Greenwood and Dunn as inadmissible hearsay, incomplete and "wholly misleading." Reply Br. at 3. Defendants'

objections to unidentified portions of the deposition testimony are OVERRULED. Defendants also object to consideration of the Sheriff's Report as inadmissible hearsay, unless the Court takes notice of the conclusions of the Sheriff's and District Attorney Reports, finding the use of deadly force justified. Reply Br. at 3. That objection is OVERRULED. Finally, defendants object to the diagram attached as Exhibit 7 to the Baghdadi Declaration as hearsay. As the Court did not rely on Exhibit 7, the Court need not reach this objection.

## CONCLUSION

For the foregoing reasons, defendants' Motion for Summary Judgment as to plaintiffs' First, Third, and Fifth Claims is DENIED. Defendants' Motion for Summary Judgment as to plaintiffs' Second and Sixth Claims is GRANTED.[15]

**IT IS SO ORDERED**.

Dated: October 24, 2013

WILLIAM H. ORRICK
United States District Judge

---

[15] As noted above, plaintiffs' dismissed their Fourth Claim by stipulation. *See* Docket No. 68.

20